# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

LINDA H.,

      Plaintiff,

vs.

MARTIN O'MALLEY,
COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

No. 23-cv-28-CJW

**REPORT AND
RECOMMENDATION**

---

Linda H. ("Claimant") seeks judicial review of a final decision of the Commissioner of Social Security ("the Commissioner") denying her application for Supplemental Security Income benefits ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. Sections 1381-85. For the reasons that follow, I recommend that the Commissioner's decision be **affirmed**.

## I.     BACKGROUND

Claimant was born in 1970. (AR[1] at 75.) She is a college graduate. (*Id*. at 219.) Claimant allegedly became disabled due to autism, Asperger's Syndrome, intellectual disability, anxiety, and panic attacks. (*Id*. at 218.) Claimant's alleged onset of disability date is February 1, 2021.[2] (*Id*. at 13, 15.) On February 1, 2021, Claimant protectively

---

[1] "AR" cites refer to pages in the Administrative Record.

[2] In her application for SSI benefits, Claimant's alleged onset of disability date was October 29, 2003. (AR at 178.) However, at the hearing, she amended the alleged onset date to the application date, February 1, 2021. (*Id*. at 13.)

Case 1:23-cv-00028-CJW-MAR   Document 15   Filed 09/04/24   Page 1 of 31

filed her application for SSI. (*Id*. at 13.) Her claim was denied originally on March 15, 2021 (*id*. at 75-83) and was denied on reconsideration on August 4, 2021. (*Id*. at 89-98.) A videoconference hearing was held on April 18, 2022, with Claimant and her attorney Corbett Luedeman[3] and Administrative Law Judge ("ALJ") Kim A. Fields. (*Id*. at 35-57.) Vocational Expert ("VE") Jeff Johnson also appeared at the hearing. (*Id*.) Claimant and the VE both testified. (*Id*.) The ALJ issued an unfavorable decision on April 27, 2022. (*Id*. at 13-29.)

Claimant requested review and the Appeals Council denied review on March 6, 2023. (*Id*. at 1-4.) Accordingly, the ALJ's decision stands as the final administrative ruling in the matter and became the final decision of the Commissioner. *See* 20 C.F.R. § 416.1481.

On March 8, 2023, Claimant timely filed her Complaint in this Court. (Doc. 3.) On November 20, 2023, all briefing was completed, and the Honorable C.J. Williams, Chief United States District Court Judge, referred the case to me for a Report and Recommendation.

## II.    DISABILITY DETERMINATIONS AND THE BURDEN OF PROOF

A disability is the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). A claimant has a disability when, due to physical or mental impairments, the claimant

> is not only unable to do [the claimant's] previous work but cannot, considering [the claimant's] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [the claimant] lives[.] . . . For purposes of the preceding sentence

---

[3] In the instant judicial review action, Claimant is also represented by Wes Kappelman.

(with respect to any individual), "work which exists in the nation economy" means work which exists in significant numbers either in the region where such individual lives or in several regions in the country.

42 U.S.C. § 1382c(a)(3)(B). A claimant is not disabled if the claimant is able to do work that exists in the national economy but is unemployed due to an inability to find work, lack of options in the local area, technological changes in a particular industry, economic downturns, employer hiring practices, or other factors. 20 C.F.R. § 416.966(c).

To determine whether a claimant has a disability, the Commissioner follows a five-step sequential evaluation process. *Swink v. Saul*, 931 F.3d 765, 769 (8th Cir. 2019). At steps one through four, the claimant has the burden to prove he or she is disabled; at step five, the burden shifts to the Commissioner to prove there are jobs available in the national economy. *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (quotation omitted).

At step one, the ALJ will consider whether a claimant is engaged in "substantial gainful activity." *Id.* If so, the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i). "Substantial activity is significant physical or mental work that is done on a full- or part-time basis. Gainful activity is simply work that is done for compensation." *Dukes v. Barnhart*, 436 F.3d 923, 927 (8th Cir. 2006) (citing *Comstock v. Chater*, 91 F.3d 1143, 1145 (8th Cir. 1996); 20 C.F.R. § 416.972(a)-(b)).

If the claimant is not engaged in substantial gainful activity, at step two, the ALJ decides if the claimant's impairments are severe. 20 C.F.R. § 416.920(a)(4)(ii). If the impairments are not severe, then the claimant is not disabled. *Id.* An impairment is not severe if it does not significantly limit a claimant's "physical or mental ability to do basic work activities." *Id.* § 416.920(c). The ability to do basic work activities means the

ability and aptitude necessary to perform most jobs. *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *see also* 20 C.F.R. § 416.921(b). These include:

> (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.

*Id.* (quotation omitted) (numbers added; internal brackets omitted).

If the claimant has a severe impairment, at step three, the ALJ will determine the medical severity of the impairment. 20 C.F.R. § 416.920(a)(4)(iii). If the impairment meets or equals one of the impairments listed in the regulations ("the listings"), then "the claimant is presumptively disabled without regard to age, education, and work experience." *Tate v. Apfel*, 167 F.3d 1191, 1196 (8th Cir. 1999) (quotation omitted).

If the claimant's impairment is severe, but it does not meet or equal an impairment in the listings, at step four, the ALJ will assess the claimant's residual functional capacity ("RFC") and the demands of the claimant's past relevant work. 20 C.F.R. § 416.920(a)(4)(iv). RFC is the most an individual can do despite the combined effect of all his or her credible limitations. *Id.* § 416.945(a); *Toland v. Colvin*, 761 F.3d 931, 935 (8th Cir. 2014). RFC is based on all relevant evidence and the claimant is responsible for providing the evidence the Commissioner will use to determine RFC. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). "Past relevant work" is any work the claimant performed within the fifteen years prior to this application that was substantial gainful activity and lasted long enough for the claimant to learn how to do it. 20 C.F.R. § 416.960(b)(1). If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. *Id.* § 416.920(a)(4)(iv).

4

At step five, if the claimant's RFC will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to show that there is other work the claimant can do, given the claimant's RFC, age, education, and work experience. *Id.* §§ 416.920(a)(4)(v), 416.960(c)(2). The ALJ must show not only that the claimant's RFC will allow the claimant to do other work, but also that other work exists in significant numbers in the national economy. *Eichelberger*, 390 F.3d at 591 (citation omitted).

## A. The ALJ's Findings

The ALJ made the following findings regarding Claimant's disability status at each step of the five-step process. The ALJ applied the first step of the analysis and determined that Claimant had not engaged in substantial gainful activity from her amended alleged onset date of February 1, 2021. (AR at 15.)

At the second step, the ALJ concluded from the medical evidence that Claimant suffered from the following severe impairments: autism spectrum disorder, intellectual disorder, anxiety, and depression. (*Id.*)

At the third step, the ALJ found that Claimant did not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (*Id.*) The ALJ evaluated Claimant's mental impairments under listings 12.04 (affective disorders), 12.06 (anxiety disorders), 12. 10 (autism spectrum disorders), and 12.15 (trauma and stress-related disorders). (*Id.* at 16.) Additionally, the ALJ considered whether the paragraph B criteria were satisfied. (*Id.*) The ALJ noted that Claimant did not meet or medically equal any of the criteria because he found that the Claimant has moderate limitation in understanding, remembering, or applying information; moderate limitation in interacting with others; moderate limitation in concentrating, persisting, or maintaining pace; and moderate limitation in adapting or managing oneself. (*Id.* at 16-17.) The ALJ concluded that the record did not show Claimant exhibited at least two "marked"

5

limitations or one "extreme" limitation and thus, the "paragraph B" criteria were not satisfied. (*Id.* at 17.) The ALJ also considered whether the paragraph C criteria were satisfied. He found as follows:

> [T]he evidence fails to establish the presence of the "paragraph C" criteria. The record does not establish that the claimant has only marginal adjustment, that is, a minimal capacity to adapt to changes in the claimant's environment or to demands that are not already part of the claimant's daily life.

(*Id.*)

At the fourth step, the ALJ determined that Claimant had the following RFC:

> [C]laimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: able to perform simple, routine tasks; simple work-related decisions; interact with coworkers occasionally; and interact with the public occasionally.

(*Id.*) Also at the fourth step, the ALJ determined that Claimant had no past relevant work. (*Id.* at 28.)

At step five, the ALJ found that there were jobs that existed in significant numbers in the national economy Claimant could perform, including cleaner II, bagger, and housekeeping cleaner. (*Id.*) Thus, the ALJ concluded that Claimant was not disabled. (*Id.* at 29.)

## B.    The Substantial Evidence Standard

The ALJ's decision must be affirmed "if it is supported by substantial evidence in the record as a whole." *Grindley v. Kijakazi*, 9 F.4th 622, 627 (8th Cir. 2021) (quoting *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996)). "The phrase 'substantial evidence' is a 'term of art' used throughout administrative law. . . . [T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek*

*v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations and quotations omitted); *see also Kraus v. Saul*, 988 F.3d 1019, 1024 (8th Cir. 2021) ("Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.") (quoting *Phillips v. Astrue*, 671 F.3d 699, 702 (8th Cir. 2012)). Thus, a court cannot disturb an ALJ's decision unless it falls outside this available "zone of choice" within which the ALJ can decide the case. *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) (citation omitted). "An ALJ's decision is 'not outside the zone of choice' simply because [the c]ourt 'might have reached a different conclusion had [it] been the initial finder of fact.'" *Kraus*, 988 F.3d at 1024 (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)).

In determining whether the Commissioner's decision meets this standard, the court considers all the evidence in the record, but does not reweigh the evidence. *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). A court considers "both evidence that detracts from the Commissioner's decision, as well as evidence that supports it." *Fentress v. Berryhill*, 854 F.3d 1016, 1020 (8th Cir. 2017). The court must "search the record for evidence contradicting the [ALJ's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)). However, "even if inconsistent conclusions may be drawn from the evidence, the [Commissioner's] decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005); *see also Igo v. Colvin*, 839 F.3d 724, 728 (8th Cir. 2016) (providing that a court "may not reverse simply because [it] would have reached a different conclusion than the [Commissioner] or because substantial evidence supports a contrary conclusion").

### III. DISCUSSION

Claimant alleges that the ALJ committed reversible error by (A) rejecting Claimant's subjective allegations of disability and making an inadequate credibility finding; (B) rejecting the opinions of treating medical providers; and (C) making a flawed RFC determination on an improperly developed record. (Doc. 15.) Claimant also argues that the ALJ who heard her claim was not constitutionally appointed. (*Id.*)

### A. Whether the ALJ Properly Evaluated Claimant's Subjective Allegations

#### 1. Parties' Arguments

Claimant argues that "the ALJ did not provide good reasons for finding [her] not credible in reporting her limitations." (Doc. 10 at 18.) In particular, Claimant asserts that she cannot handle criticism and reacts with anger and aggression and by throwing tantrums. (*Id.* at 19.) Claimant maintains that various medical opinions are "consistent with [her] report of difficulty responding to supervisors and criticism" and her mental health limitations are "consistent with [her] outbursts at her various appointments." (*Id.* at 20.) Claimant points out that "[t]he ALJ does not explain clearly why supervisor-related limitations were rejected, generally hinting that counseling records showed improvement after early 2021, given [she] could interact with family and have a friend . . . over to her house." (*Id.* at 21.) Claimant argues that the ability to see family and have a friend over to her house "does not indicate an ability to perform full-time competitive work without any limitations on interaction with supervisors or restrictions on workplace changes." (*Id.* at 22.) Claimant contends that the ALJ's reasoning and "erroneous inferences" require remand. (*Id.*)

The Commissioner argues that the "ALJ properly considered and discussed [Claimant's] subjective complaints." (Doc. 12 at 9.) The Commissioner maintains that "[r]eview of the evidence in this case shows that inconsistencies existed between [Claimant's] subjective complaints and the record as a whole." (*Id.* at 17.) The

Commissioner concludes that the "ALJ properly found [Claimant's] subjective complaints were not supported by the objective medical evidence or other evidence in the record[.]" (*Id.*)

**2.    *Relevant Law***

When assessing a claimant's credibility, "the ALJ must consider all of the evidence, including objective medical evidence, the claimant's work history, and evidence relating to the factors set forth in *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)." *Vance v. Berryhill*, 860 F.3d 1114, 1120 (8th Cir. 2017). In *Polaski*, the Eighth Circuit stated that:

> The [ALJ] must give full consideration to all the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; [and] (5) functional restrictions.

739 F.2d at 1322. An ALJ is not required to methodically discuss each *Polaski* factor as long as the ALJ "acknowledge[s] and examin[es] those considerations before discounting [a claimant's] subjective complaints." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (citing *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)). The ALJ, however, may not disregard "a claimant's subjective complaints solely because the objective medical evidence does not fully support them." *Renstrom v. Astrue*, 680 F.3d 1057, 1066 (8th Cir. 2012) (quoting *Wiese v. Astrue*, 552 F.3d 728, 733 (8th Cir. 2009)).

Instead, an ALJ may discount a claimant's subjective complaints "if there are inconsistencies in the record as a whole." *Wildman v. Astrue*, 596 F.3d 959, 968 (8th Cir. 2010). Where an ALJ seriously considers, but for good reason explicitly discredits a claimant's subjective complaints, the court will not disturb the ALJ's credibility

9

determination. *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001); *see also Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007) (providing that deference is given to an ALJ when the ALJ explicitly discredits a claimant's testimony and gives good reasons for doing so). "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." *Igo*, 839 F.3d at 731 (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001)).

### 3.   Analysis

The record does not support Claimant's argument that the ALJ failed to provide good reasons for discounting Claimant's subjective complaints. The ALJ articulated her reasons for discounting Claimant's allegations at length considering the hearing testimony, Claimant's medical records, and doctors' medical opinions. (AR at 18-24.)

The ALJ found that Claimant's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent wIth the medical evidence and other evidence in the record[.]" (*Id.* at 25.) The ALJ thoroughly considered the intensity and severity of Claimant's symptoms in his discussion of Claimant's RFC. (*Id.* at 160-66.) In doing so the ALJ addressed the relevant *Polaski* factors and considered: (1) the Claimant's daily activities (*Id.* at 166); (2) the duration, frequency, and intensity of the condition (*id.* at 160-66); (3) the use of medication (*id.* at 164, 166); (4) precipitating and aggravating factors (*id.* at 160-66); and (5) functional restrictions (*id.*). *See Wildman*, 596 F.3d at 968.

Specifically, the ALJ determined that:

The claimant experiences some symptoms and limitations; however, the record does not fully support the severity of the claimant's allegations. As discussed in full detail above, the objective medical findings of record failed to support the claimant's allegations of disabling symptoms and limitations. The claimant was found to have moderate limitations in the broad paragraph B criteria domains of understanding, remembering, or applying

information, interacting with others, concentration, persistence, or maintaining pace, and adapting or managing oneself. The above residual functional capacity accounts for more detailed functional limitations that correlate to these broad domains, including: limitations to understanding, remembering, and carrying out only simple, routine tasks, having the judgment and ability to deal with changes for simple work related decisions, and the ability to occasionally interact with coworkers and the public.

More specifically, while acknowledging the claimant has some limitations related to her mental health diagnoses, the claimant's testimony and function report indicated an ability to perform at least simple, routine tasks. Inconsistent with allegations regarding disabling memory issues, problems completing tasks, and difficulties concentrating, understanding, and following instructions, the claimant endorsed a relatively wide range of daily activities. In her function report, the claimant indicated she cared for her own personal tasks independently. She testified to showering only every three or four days; however, psychiatric and therapy sessions indicated intact appearance and hygiene (See Exhibits B5E; B9F; B10F, p. 6; B12F). Notably, while records indicated some community supports, the claimant reported living independently, preparing simple meals, doing household chores, driving, going out independently, shopping in stores, and handling her own finances (Exhibits B5E; B15F; Hearing Testimony). She was able to understand instructions and concentrate enough to complete psychological testing (Exhibits B3F; B4F). Psychological and psychiatric evaluations indicated some limited memory, concentration, insight, and judgment; however, Dr. Sieleni noted full orientation, normal appearance, fair eye contact, normal speech, intact thought processes, unimpaired memory, concentration within defined limits, good fund of knowledge, and good insight and judgment (Exhibit B10F, p. 13). Similarly, counseling sessions noted some periods of poor attention, insight, and judgment, but generally noted fair to good attention, insight, judgment, thought processes, and behavior, despite noting anxiety (Exhibit B12F). Overall, evidence from daily activities and mental status exams supported an ability to understand, remember, concentrating, and perform simple, routine tasks.

Socially, the claimant reported limited interaction on a social basis. She alleged problems handling being around her parents and brother for more than an hour, even during holidays. She reported being more antisocial. However, she also reported driving, going out independently, and shopping

independently (Exhibit B5E).  Records noted some periods of frustration where the claimant became anxious and threw items during a psychological evaluation, supporting some limitations socially, at least times during high periods of anxiety (Exhibit B9F).  However, she presented in a normal fashion without significant anxiety or issues interacting appropriately during another evaluation (Exhibit B10F, p. 6).  Most persuasively, counseling records showed the claimant saw moderate improvement of anxiety following assessments in early 2021.  While indicating initially that she had high anxiety and would throw or hang up the phone, records indicated better coping skills going forward, including the ability to interact with family and have a friend over to her house (Exhibits B12F; B17F).  Based on the evidence of record, the undersigned finds the claimant would be capable of occasional interaction with coworkers and the public, considering her ability to live independently, seek community services, drive, and shop independently.

As for adapting or managing oneself, the claimant reported handling stress and changes in routine poorly.  Otherwise, she reported doing self-care tasks, preparing simple meals, managing household chores, driving, shopping, and going out independently (Exhibit B5E).  Psychiatric and counseling records, at times, indicated poor insight and judgment while anxious; however, the weight of counseling records generally indicated fair to good insight and judgment (Exhibits B9F; B10F, p. 6; B12F; B17F).  Based on these findings, the undersigned finds the claimant would be capable of simple work-related decisions.

(AR at 25-26.)   Contrary to Claimant's argument, the ALJ thoroughly addressed Claimant's social limitations, acknowledging difficulties at a psychological evaluation but also pointing out that Claimant "presented in a normal fashion without significant anxiety or issues interacting appropriately during another evaluation (Exhibit B10F, p. 6), and also noting that counseling records showed improvement after early 2021 demonstrating "better coping skills . . . including the ability to interact with family and have a friend over to her house (Exhibits B12F; B17F)."  (AR at 26.)

The ALJ also noted that her credibility determination was consistent with the state agency psychologists who reviewed Claimant's medical history and records:

Find[ing] the opinions from the State agency psychologists generally persuasive, as they adequately supported their findings with a detailed explanation of the evidence available when they offered their opinions. For instance, the psychologists reviewed the psychological exam and testing performed in February 2021, noting depressed mood, limited memory and concentration, poor insight and judgment, Full-Scale IQ of 78, and diagnoses of autism spectrum disorder, generalized anxiety disorder, and major depressive disorder (Exhibits B3F; B4F). Additionally, the psychologists reviewed counseling records and statements of support from Ms. Schmidt-Luhring, finding said statements unpersuasive (Exhibits B5F; B12F). In reviewing psychiatric findings, the consultants noted the claimant's May 2021 exam showing neutral mood, full orientation, good insight and judgment, intact memory, and appropriate thought content (Exhibit B10F, p. 6). The consultants also reviewed the claimant's reported daily activities, noting that her allegations of problems understanding appeared inconsistent with her ability to follow instructions needed to complete psychological testing in February 2021 (Exhibits B5E; B3F; B4F). Consistent with the State agency findings and opinions, the claimant's counselor noted similar mental status findings during subsequent sessions through early 2022, showing some anxiety and depression, variable with generally fair to good attention, and generally fair insight and judgment (Exhibits B17F; B21F).

(*Id.* at 27.)

In sum, I find that the ALJ appropriately discounted Claimant's subjective allegations of disability because the ALJ found inconsistencies in the evidence as a whole and considered the *Polaski* factors. *See Wildman*, 596 F.3d at 968-69. As such, I find the ALJ did not err in discounting Claimant's testimony or her allegations because substantial evidence as a whole supported the ALJ's credibility determination. It is not for this Court to reweigh evidence. Thus, I recommend the District Court affirm this part of the ALJ's decision.

13

*B.*     *Whether the ALJ Properly Evaluated Medical Source Opinions*

  *1.*     *Relevant Law*

Claimant's claim was filed after March 27, 2017. Therefore, the rules articulated in 20 C.F.R. Sections 404.1520c and 416.920c apply to analysis of this opinion. Under these rules, no medical opinion is automatically given controlling weight. 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Opinions from medical sources are evaluated using the following factors: (1) supportability, (2) consistency, (3) provider's relationship with the claimant, (4) specialization, and (5) other factors. *Id.* §§ 404.1520c(c), 416.920c(c). Supportability and consistency are the most important factors when determining "how persuasive the ALJ find[s] a medical source's medical opinions . . . to be." *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2). The ALJ "may, but [is] not required to, explain how [he or she] considered the factors in paragraphs (c)(3) through (c)(5). . . ." *Id.*

Supportability concerns the internal consistency that a source's opinion has with the source's own findings and notes. "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . ., the more persuasive the medical opinions . . . will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). Consistency concerns the external consistency that the source's opinion has with the findings and opinions of other sources. "The more consistent a medical opinion[] . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] . . . will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

  *2.*     *Schmidt-Luhring*

    *a.*     *Parties' Arguments*

Claimant argues that the "ALJ did not articulate sufficient reasons for finding Ms. Schmidt-Luhring's counselor opinions not persuasive." (Doc. 10 at 22.) The

Commissioner argues that "the ALJ articulated sufficient reasons for finding the letter opinion of Ms. Schmidt-Luhring generally unpersuasive." (Doc. 12 at 18.)

**b.** *Pertinent Medical Evidence*

On March 9, 2021, Mary Schmidt-Luhring, a Licensed Mental Health Counselor, provided the Disability Determination Service Bureau with a letter in support of Claimant "as she makes efforts to communicate her significant need for support for mental health concerns which limit her ability to obtain and maintain stable, consistent, and understanding employment opportunities." (AR at 347.) Schmidt-Luhring noted that, based on the finding of Dr. Luke Hansen, Psy.D., Claimant suffered from autism spectrum disorder, generalized anxiety disorder, and major depressive disorder. (*Id.*) Schmidt-Luhring also noted that in addition to Dr. Hansen's diagnoses, she had diagnosed Claimant with panic disorder and generalized social phobia. (*Id.*) Schmidt-Luhring described Claimant's mental health difficulties as follows:

> Client experiences high anxiety in situations such as driving, sitting in a waiting room, interacting with strangers, being in a public space, and maintaining eye contact and conversational flow. Client also struggles to read social cues which has impacted client's ability to recognize appropriate content in conversation. [Claimant] often speaks her mind unfiltered which while truthful, is not always well received by others. It is these patterns of communication and social involvement which make it most difficult for client to obtain and maintain employment. The above-mentioned traits in this paragraph are common for individuals who experience Autism Spectrum Disorder (ASD) with severe anxiety symptoms. Due to ASD not having been addressed previously, and client not yet having learned a skill set for coping with ASD, Generalized Anxiety Disorder (GAD), Panic Disorder, and Social Phobias have all been intensified. The current severity of client's symptoms would, without a doubt, severely limit client's ability to meet expectations of a work environment. After 4 years of knowing client and forming a strong rapport, it is still difficult for client to have a conversation with me without hanging up the phone, pacing, hitting herself, screaming, or leaving the room without a large variety of active coping skill utilization and reminder prompts.

15

Due to mental health symptoms mentioned, client often has difficulties with understanding or remembering abstract communication which do not include step-by-step, concrete objectives. When activated by an emotionally intense or pressure-based request, [Claimant] is unable to maintain concentration and will often express herself through symptoms of panic which may include breaking things (phone, glasses, and computer are common, recurrent items suspect (*sic*) to damage), speaking inaudibly, screaming, crying, rapid breathing, swearing, threats of suicide, and truancy/leaving or running away. When it comes to following instructions, client often follows instructions with such rigidity that if someone is not following instructions, client may physically involve herself to enforce the expected behavior (i.e. physically holding spouse and forcing prescribed breathing treatments or oxygen devices or threatening to put masks on people who are not wearing them/adjust masks on people wearing them improperly). While client is able to follow instructions thoroughly, she is not always able to recognize or cope with exceptions (whether or not the exceptions are appropriate/acceptable).

(*Id.* at 348.)

### c. *Analysis*

In her decision the ALJ considered and addressed Schmidt-Luhring's opinions. Specifically, the ALJ thoroughly reviewed Claimant's counseling records with Schmidt-Luhring:

In reviewing counseling records submitted by Mary Schmidt-Luhring, MA, NCC, LMHC, while noting variable anxiety and depressive symptoms, records noted moderate levels of improvement with counseling alone. More specifically, sessions in February and March 2021 indicated the claimant had issues self-regulating, high levels of reactivity without ability to pause, and was overwhelmed, ending the call abruptly, hanging up on the counselor, and even throwing her phone. This was apparently due to the counselor discussing changing appointment time, resulting in the claimant becoming upset, yelling, hyperventilating, and walking away for the phone. She noted stressors related to her husband passing away, reporting she was coping by drinking alcohol to some of these stressors. Clinical findings showed anxious/angry mood and affect, fair to poor insight and judgment,

distracted attention, tangential thought processes, and demanding/argumentative/aggressive behaviors (Exhibit B12F, pp. 1-4).

Considerably (*sic*), counseling sessions by later March 2021 indicated improvement both in presentation during sessions and objectively through mental status findings. The claimant continued endorsing anger directed at her deceased husband and her parents, the latter regarding not previously noticing her autism diagnosis. Ms. Schmidt-Luhring noted the claimant was cooperative, alert, thought processes were circumstantial yet goal directed, she was appropriately dressed, had rapid/loud speech, anxious and dysphoric mood, good insight and judgment, and mood attention. The counselor noted moderate improvement at this time (Exhibit B12F, pp. 11-12). From April through June, counseling sessions noted the claimant exhibited frustrations surrounding IHH workers and poor perceived quality of care, where she threw her phone, yelled, and hung up the phone. She also noted feeling overwhelmed during mental health appointments, although reported the ability to attend other medical appointments, including seeing a chiropractor and eye doctor. She also reported visiting her parents twice a week and exhibited improved behaviors during sessions, such as setting phone down and not throwing it. Clinically, the counselor noted some depression, anxiety, and anger, fair to good attention, tangential and goal directed thoughts, and variable ranging from poor to good judgment and insight, noting moderate improvement (*Id.* at 13-24).

During monthly to bimonthly evaluations from July 2021 through March 2022, counseling sessions noted some ongoing anxiety and depression; however, mental status findings appeared relatively intact. More specifically, records from July indicated the claimant was having a property dispute with a neighbor; however, she was able to appropriately reach out to the city and police regarding this issue. In addition, while indicating limited social interaction, the counselor suggesting the claimant attend a craft group, suggesting an ability to interact with others as needed. Mental status findings showed depressed and anxious mood/affect, good attention, fair insight and judgment, goal directed thoughts, and continued noting moderate improvement (Exhibit B17F, p. 2). In August, records indicated the claimant had broken her glasses during a panic attack; however, she was able to immediately drive to the store to get them fixed (*Id.* at 7).

Case 1:23-cv-00028-CJW-MAR   Document 15   Filed 09/04/24   Page 17 of 31

In following months, the claimant was able to pay off her home and met with CSP worker in person, despite reporting not wanting to be out in public. While noting some anxiety, the counselor continued to indicate intact functioning during exams, including fair to good insight and judgment, variable to good attention, good cooperation, and goal directed thought processes (*Id.* at 10-20). In January 2022, the claimant reported spending time with family over the holidays and having a friend over, supporting a basic ability to interact with others. She noted some anxiety and crying in her car due to feeling overwhelmed entering stores; however, testified she shopped independently. She endorsed having panic attacks surrounding changes in routine, alleging these occurred 2-4 times daily. However, counseling sessions, while noting some anxiety and rapid speech, noting good insight, judgment, and attention (*Id.* at 25). Most recently, she reported anxiety/panic being triggered by doctor appointments and fearing taking medications. Inconsistently, the counselor noted anxious mood and affect with fair insight and judgment, cooperative behavior, goal directed thoughts with some flight of ideas/ruminations, adequate dress and grooming, and fair attention. The counselor continued noting the claimant was much improved (Exhibit B21F).

(AR at 20-21.) The ALJ also thoroughly discussed Schmidt-Luhring's March 2021 letter:

In addition, the claimant's counselor, Mary Schmidt-Luhring, LMHC, submitted a letter of support. She reported providing 59 hours of therapy starting in May 2016, noting 21 sessions since February 2020, for diagnoses of autism spectrum disorder and borderline intellectual functioning. The counselor noted that prior to the pandemic the claimant had issues attending session more than once a month due to anxiety leaving the home and attending sessions; however, noted more frequent meetings via tele-communications recently. She reported the claimant experienced high anxiety in situations such as driving, sitting in a waiting room, interacting with strangers, being in public space, and maintaining eye contact. She reported the claimant had issues reading social cues and spoke in an unfiltered manner, indicating this made communication and social involvement difficult. Ms. Schmidt-Luhring reported, "Due to mental health symptoms mentioned, client often had difficulties with understanding or remembering abstract communication which do not include step-by-step, concrete objectives. When activated by an emotionally intense or pressure-based request, [Claimant] is unable to maintain concentration and will often

18

express herself through symptoms of panic which may including breaking things (phone, glasses, and computer are common, recurrent items suspect to damage), speaking inaudibly, screaming, crying, rapid breathing, swearing, threats of suicide, and truancy/leaving or running away. When it comes to following instructions, client often follows instructions with such rigidity that if someone is not following instructions, client may physically involve herself to enforce the expected behavior (i.e. physically holding spouse and forcing prescribed breathing treatments of oxygen devices or threatening to put masks on people who are not wearing them/adjust masks on people wearing them improperly). While client is able to follow instructions thoroughly, she is not always able to recognize or cope with exceptions (whether or not the exceptions are appropriate/acceptable)["] (Exhibit B5F).

(*Id.* at 22-23.) In evaluating Schmidt-Luhring's opinions, the ALJ determined that:

The undersigned finds the statement/opinions submitted by the claimant's counselor generally unpersuasive. Similar to the discussion of the opinions from Dr. Hansen, as noted above, the proffered findings were rather vague in nature. Moreover, while counseling records initially indicated some significant anxiety issues, records noted "much/moderate" improvement during subsequent exams. Mental status findings during counseling sessions initially indicated the claimant was anxious, depressed, demanding, aggressive, and had poor insight, judgment, attention, and impaired thought processes. However, throughout much of the period under consideration, the counselor, in noting improvement, showed fair to good judgment and insight, fair to good attention, improved thought processes, and appropriate appearance (See Exhibits B12F; B17F). Additionally, psychiatric records noted some limitation but greater functioning than alleged by the counselor. While one psychiatrist indicated poor concentration, insight, and judgment, the claimant was alert, oriented, had normal appearance, fair eye contact, normal speech, unimpaired memory, and fair fund of knowledge (Exhibit B9F). Contrary to the claimant's allegations of various symptoms during an evaluation, Dr. Sieleni noted neutral mood, intact thought processes, appropriate thought content, good insight, good judgment, unimpaired memory, and concentration within defined limits (Exhibit B10F, p. 13). Furthermore, the claimant reported an ability to perform various daily

19

activities, all of which appeared inconsistent with the proffered opinions (Exhibit B5E).

(*Id.* at 23.)

Having reviewed the entire record, I find that the ALJ properly considered and weighed the opinion evidence provided by Schmidt-Luhring. It is evident from the ALJ's decision that she considered Schmidt-Luhring's opinions as they relate to Claimant's mental health concerns. Indeed, the ALJ limited Claimant to performing simple, routine tasks, engaging in simple work-related decisions, occasional interaction with co-workers, and occasional interaction with the public. (*Id.* at 17.) Contrary to Claimant's complaints about the ALJ's analysis of Schmidt-Luhring's opinions, the ALJ's determination is supported by the record. Beginning on March 5, 2021, Claimant's counseling notes show "minimal" improvement compared to her initial intake through March 10, 2021. (Id. at 403, 405.) Beginning on March 24, 2021, Claimant's counseling notes generally show "much" or "moderate" improvement compared to her initial intake through March 30, 2022.[4] (*Id.* at 411, 417, 419, 421, 423, 425, 560, 566, 572, 575, 578, 584, 629.) The ALJ also noted the inconsistency of Schmidt-Luhring's opinions with Dr. Sieleni's objective mental status finding on May 27, 2021, after spending an hour with Claimant, where he found Claimant "alert and oriented to person, place and time," "[a]ppearance within normal limits and neat," fair eye contact, normal rate and volume of speech, "thought process . . . intact, logical, and normal," appropriate thought, good insight, good judgment, no memory impairment, "[c]oncentration within defined limits," neutral mood, and affect consistent with mood. (*Id.* at 387.) Based on the foregoing, it is clear that the ALJ found Schmidt-Luhring's opinions unsupported and inconsistent with the

---

[4] On April 7, 2021, Claimant's counseling notes showed only minimal improvement. (AR at 413.) On April 21, 2021, August 11, 2021, September 8, 2021, December 6, 2021, February 2, 2022, and March 2, 2022, Claimant's counseling notes showed both "minimal" and "much" improvement. (*Id.* at 415, 563, 569, 582, 587, 590.)

record as a whole as they related to the limitations she placed on Claimant's ability to work. Even if different conclusions could be drawn on this issue, the conclusions of the ALJ should be upheld because they are supported by substantial evidence on the record as a whole. *See Guilliams*, 393 F.3d at 801. It is not for this Court to reweigh evidence. Accordingly, I conclude that the ALJ properly evaluated Schmidt-Luhring's opinions, and I recommend that the District Court affirm this part of the ALJ's decision.

### 3. Dr. Hansen

#### a. Parties' Arguments

Claimant argues that the "ALJ did not articulate sufficient reasons for finding Dr. Hansen's opinions not persuasive." (Doc. 10 at 30.) The Commissioner argues that "substantial evidence supports the ALJ's evaluation of Dr. Hansen's opinions." (Doc. 12 at 21.)

#### b. Pertinent Medical Evidence

On February 26, 2021, Dr. Luke R. Hansen, Psy.D., conducted a psychological evaluation for Claimant. (AR at 340.) Dr. Hansen made the following mental status and behavioral observations:

> Patient presented for today's visit dressed in casual attire and exhibited marginal hygiene. Mood was moderately depressed and affect congruent. Content of thought appropriate for the situation. Patient denies unusual thinking, delusions or hallucinations. Patient is oriented times three and memory and concentration is limited. Judgment and insight into problem areas is poor. Patient became easily upset, frustrated and overwhelmed during the test administration. At one point on the Block Design task, she became so frustrated that she was in tears, was visibly tremulous and agitated, and threw the blocks across the examiner's room. Patient denies suicidal or homicidal ideation and there is no indication of substance abuse or domestic violence in the home.

(*Id*. at 341.) Upon psychological testing, elevations were noted on Avoidant, Schizotypal, and Paranoid personality scales, which "can be consistent with the odd or

unusual behaviors often associated with High Functioning Autism Spectrum Disorder."
(*Id.*) Scores from another test provided "strong support for a diagnosis of high
functioning ASD [(Autism Spectrum Disorder)]." (*Id.* at 342.) Claimant's full scale IQ
score was 78, borderline intellectual functioning. (*Id.*) Dr. Hansen opined that
Claimant's "Full Scale IQ score of 78 is consistent with a diagnosis of Borderline
Intellectual Functioning, and suggests that [her] overall intellectual limitations very likely
contribute to her overall difficulties with judgment, insight, problem solving, coping, and
decision making." (*Id.*) Dr. Hansen diagnosed Claimant with autism spectrum disorder,
generalized anxiety disorder, and major depressive disorder. (*Id.*) Dr. Hansen
recommended that Claimant:

> continue her application for Social Security Disability benefits, based on
> today's results and observations of her behavior and severe limitations in
> coping. The likelihood of her maintaining consistent, gainful employment
> appears to be very unrealistic. Among the likely obstacles to her
> maintaining work, would include comprehension concerns, working
> memory difficulties, pace concerns, extremely limited frustration tolerance,
> inability to manage emotions or adapt to change, and very significant
> interpersonal difficulties.

(*Id.* at 344.)

In March 2022, Claimant had a follow-up appointment with Dr. Hansen. (*Id.* at
622-27.) The only significant change from the February 2021 evaluation was a new
diagnosis of mild intellectual disability.[5] Dr. Hansen explained that:

> On March 25, 2022, [Claimant] returned for follow up, but this time rather
> than attending alone, she presented with her friend Toni Stumpf, from
> Above and Beyond. Ms. Stumpf, came to know [Claimant] while helping
> her husband when he was in hospice. When seen in 2021, a third-party
> measure of adaptive functioning concerns could not be gathered, given that
> no one accompanied her to the appointment. Ms. Stumpf was therefore

---

[5] It appears that Dr. Hansen used the same evaluation from February 2021 and indicated any
changes by additional italicized text. (AR at 622-27.)

asked to complete the ABA-3 today to help assess [Claimant's] adaptive functioning/daily living skills. On this measure, [Claimant's] total Global Adaptive functioning composite score of 66 reveals significant deficits in adaptive functioning, consistent with a diagnosis of a Mild Intellectual Disability. Deficits were noted across numerous areas of adaptive functioning, including communication, community use, functional academics, social skills, self-direction, self-care, health and safety awareness, and home living skills. Given the previous IQ score of 78 last year . . . and the presence of significant adaptive functioning deficits for her age, suspicions were raised regarding the possibility of a mild intellectual disability diagnosis[.] . . . For that reason, [Claimant] was administered a supplemental subtest of the WAIS-IV[.] . . . This was a measure of social judgment, abstract reasoning, common sense and expressive language. Given the additional diagnosis of an Autism Spectrum Disorder it is not surprising that [Claimant] struggled on this subtest. If the Comprehension subtest score is substituted for one of the core Verbal Comprehension subtests administered in 2011, [Claimant's] full scale IQ score drops from 78 to 74, and becomes much more in line with a diagnosis of a Mild Intellectual Disability, particularly when take in conjunction with significant adaptive functioning deficits.

(*Id.* at 625.)

### c. Analysis

In her decision the ALJ considered and addressed Dr. Hansen's opinions. Specifically, the ALJ thoroughly reviewed Dr. Hansen's evaluations of Claimant:

Following her application for disability, the claimant was referred for a psychological evaluation at the request of her primary care provider and counselor for purposes of undergoing testing to assess for autism spectrum disorder, anxiety, or an underlying intellectual disability. The claimant reported panic attacks increasing in severity of the last few years during which she might scream, yell, curl up and cry. She noted recently losing her husband, currently living by herself, poor sleep, not having friends, problems identifying humor and sarcasm, depression, poor self-esteem, and being bothered by noises and textures. On mental status evaluation, the claimant was moderately depressed with congruent affect. She was casually dressed, adequately groomed, fully oriented, had limited memory and concentration, and marginal insight and judgment into problems areas.

During psychological testing, the claimant was easily upset, frustrated, and overwhelmed. The psychologist noted she became frustrated during Block Design task, resulting in tears, tremulousness, and agitation, and throwing blocks across the room. In performing MCMI-IV, BDI-II, MAQ, and ASQ testing, the psychologist noted scores consistent with depression, anxiety, and autism spectrum disorder. WAIS-IV cognitive testing revealed a Verbal Comprehension score of 83, Perceptual Reasoning score of 90, Working Memory score of 66, Processing Speed score of 84, and a Full-Scale IQ of 78. Diagnostically, the psychologist reported impressions of autism spectrum disorder (high functioning), generalized anxiety disorder, and major depressive disorder (Exhibits B3F; B4F; B10F, pp. 1-5).

In March 2022, the claimant followed-up with Dr. Hansen, accompanied by her friend, Toni Stumpf, and reporting adaptive functioning concerns. Ms. Stumpf completed ABAS-3 testing to assess the claimant's adaptive functioning and daily living skills with a composite score of 66 indicating significant deficits in areas such as communication, community use, functional academics, social skills, self-direction, self-care, health and safety, and home living skills. Based on this subjective report, the psychologist noted that in substituting the comprehension subtest score with the core Verbal Comprehension subtest from 2021 testing, the claimant's Full-Scale IQ dropped to 74, indicating this was more in line with mild intellectual disability when taken in conjunction with significant adaptive functioning deficits (Exhibit B20F).

(AR at 19.) The ALJ also addressed Dr. Hansen's opinions related to her evaluations:

Following psychological evaluations, Luke Hansen, Psy.D., reported, "While it is clear that depressive and anxiety symptoms remain severe at times, test results suggest that underlying diagnoses of ASD and Borderline Intellectual Functioning, likely contribute dramatically to these symptoms and related difficulties with adequate judgment, insight, problem solving, decision making and effective coping and self-care. Dramatic difficulties managing frustration were demonstrated during the testing administration itself, as she frequently became agitated, tearful and genuinely tremulous when she could not complete a task (at one point throwing testing blocks across the room)." Dr. Hansen noted, "[Claimant] was urged to continue her application for Social Security Disability benefits, based on today's results and observations of her behavior and severe limitations in coping.

The likelihood of her maintaining consistent, gainful employment appears to be very unrealistic. Among the likely obstacles to her maintaining work, would include comprehension concerns, working memory difficulties, pace concerns, extremely limited frustration tolerance, inability to manage emotions or adapt to change, and very significant interpersonal difficulties." (Exhibits B4F, pp. 5-6; B20F).

(*Id.* at 22.) In evaluating Dr. Hansen's opinions, the ALJ determined that:

Overall, the undersigned finds the opinions proffered by Dr. Hansen unpersuasive. Notably, the statements and/or opinions offered following this evaluation were vague, failing to outline specific functional limitations regarding what activities the claimant would be capable of performing. While the doctor performed psychological testing supporting some limitations related to anxiety, depression, and intellectual deficits, the statements/opinions appeared inconsistent with the claimant's own reported daily activities, as noted in her function report (Exhibit B5E). Additionally, the opinions appeared at odds with psychiatric and counseling records. While records indicated anxious/depressed moods and periods of limited insight, judgment, and attention, the claimant was generally alert, oriented, able to maintain eye contact, had intact thought processes, intact thought content, unimpaired memory, fair to good attention, and fair fund of knowledge (Exhibits B9F; B10F, p. 6; B12F; B17F).

(*Id.*)

Having reviewed the entire record, I find that the ALJ properly considered and weighed the opinion evidence provided by Dr. Hansen. It is evident from the ALJ's decision that she considered Dr. Hansen's opinions as they relate to Claimant's mental health concerns. Indeed, the ALJ limited Claimant to performing simple, routine tasks, engaging in simple work-related decisions, occasional interaction with co-workers, and occasional interaction with the public. (*Id.* at 17.)

Contrary to Claimant's complaints about the ALJ's analysis of Dr. Hansen's opinions, the ALJ's determination is supported by the record. The ALJ's determination that Dr. Hansen's opinions were "vague" because Dr. Hansen failed to "outline specific

functional limitations regarding what activities the claimant would be capable of performing" while stating that Claimant finding gainful employment would be "very unrealistic" was not improper. *See Perkins v. Astrue*, 648 F.3d 892, 898 (8th Cir. 2011) ("'A treating physician's opinion that a claimant is disabled or cannot be gainfully employed gets no deference because it invades the province of the Commissioner to make the ultimate disability determination'") (quoting *House v. Astrue*, 500 F.3d 741, 745 (8th Cir. 2007)); *see also Jordan v. Kijakazi*, No. 22-2843, 2023 WL 2733485, at *1 (8th Cir. Mar. 31, 2023) (per curiam) (providing that a statement from a medical source that does not assess a claimant's functional limitations is not an opinion under 20 C.F.R. § 416.913(a)). The ALJ also noted inconsistencies with Dr. Hansen's opinions and Claimant's own reported activities of daily living, such as performing general hygiene, performing housework and yard work (shoveling and mowing), preparing meals, caring for her husband (doing "everything" for him) until his death in January 2021, caring for and grooming her cat, shopping for basic needs, the ability to drive, and crocheting 30 oversize throws in 2020. (AR at 255-59.) The ALJ also found that Dr. Hansen's findings were inconsistent with other psychiatric records which reported that Claimant: (1) was alert and oriented to person, place, and time; (2) had fair eye contact; (3) had a normal rate and volume of speech; (4) had appropriate speech content; (5) had appropriate thought processing and content; (6) appeared neat and within normal limits; (7) had normal and logical thought process; (8) had good insight and judgment; (9) had unimpaired short-term and long-term memory; and (10) had concentration withing defined limits. (*Id.* at 371 (Dr. Munagala, M.D.), 387 (Dr. Sieleni, M.D.).) Additionally, the ALJ found that Claimant's counseling notes demonstrated, beginning on March 24, 2021, "much" or "moderate" improvement compared to her initial intake through March 30, 2022. (*Id.* at 411, 417, 419, 421, 423, 425, 560, 566, 572, 575, 578, 584, 629.) Based on the foregoing, it is clear that the ALJ found Dr. Hansen's

26

opinions unsupported and inconsistent with the record as a whole as they related to the limitations she placed on Claimant's ability to work. Even if different conclusions could be drawn on this issue, the conclusions of the ALJ should be upheld because they are supported by substantial evidence on the record as a whole. *See Guilliams*, 393 F.3d at 801. It is not for this Court to reweigh evidence. Accordingly, I conclude that the ALJ properly evaluated Dr. Hansen's opinions, and I recommend that the District Court affirm this part of the ALJ's decision.

## C. Whether the ALJ Fully and Fairly Developed the Record in Determining Claimant's RFC Assessment

### 1. Parties' Arguments

Claimant points out that in April and October 2021, Schmidt-Luhring's counseling notes indicated that Claimant saw a chiropractor. (Doc. 10 at 32, AR at 414, 574.) Claimant also points out that in May 2021 at a psychiatric evaluation contained a notation to "chiro." (*Id.*, AR at 383.) Additionally, at a disability evaluation in January 2022, the evaluating doctor noted Claimant had an antalgic gait and crepitus in her knees. (*Id.*, AR at 511.) Further, Claimant points out that at the hearing, she testified that she had difficulty walking, standing, and sitting. (*Id.* at 33, AR at 42.) Claimant maintains that the ALJ "should have more fully developed the record concerning [her] physical limitations by ordering a consultative examination, potentially x-ray imaging, and by obtaining chiropractic and other records, if any, relating to her physical impairments and limitations[.]" (*Id.*) The Commissioner argues substantial evidence supports the ALJ's RFC and the ALJ was not required to further develop the record. (Doc. 12 at 22-25.)

### 2. Relevant Law

The ALJ also has a duty to develop the record fully and fairly. *Cox v. Astrue*, 495 F.3d 614, 618 (8th Cir. 2007). "There is no bright line rule indicating when the

Case 1:23-cv-00028-CJW-MAR   Document 15   Filed 09/04/24   Page 27 of 31

[ALJ] has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis." *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008).

The ALJ is also responsible for assessing a claimant's RFC, and his or her assessment must be based on all of the relevant evidence. *Guilliams*, 393 F.3d at 803. Relevant evidence for determining a claimant's RFC includes "medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations." *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006) (quoting *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004)). While an ALJ must consider all of the relevant evidence when determining a claimant's RFC, "the RFC is ultimately a medical question that must find at least some support in the medical evidence of record." *Casey v. Astrue*, 503 F.3d 687, 697 (8th Cir. 2007).

### 3.  *Analysis*

Claimant's argument is without merit.  Passing references to seeing a chiropractor without any records from a chiropractor and no evidence of ever being treated for knee pain is not the type of evidence which would compel and ALJ to seek a consultative examination or request possible evidence from an unknown chiropractor or other unknown treating source.  Indeed, as the Commissioner points out Claimant did not allege any physical impairments as a basis for her alleged disability, *see* AR at 218, 266, and at the hearing, her attorney admitted that "this case is a, in my opinion, Your Honor, primarily a mental health case."  (AR at 40.)  "Ultimately, the claimant bears the burden of proving disability and providing medical evidence as the existence and severity of an impairment."  *Kamann v. Colvin*, 721 F.3d 945, 950 (8th Cir. 2013).  Claimant has not come close to meeting this burden.  Under such circumstances, "'an ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'"  *Id.* (quoting *Naber v. Shalala*, 22 F.3d 186, 189 (8th Cir. 1994)); *see also McCoy v. Astrue*, 648 F.3d 605,

612 (8th Cir. 2011) ("While an ALJ does have a duty to develop the record, this duty is not never-ending and an ALJ is not required to disprove every possible impairment"); *Martise v. Astrue*, 641 F.3d 909, 926-27 (8th Cir. 2011) ("While an ALJ should recontact a treating or consulting physician if a critical issue is undeveloped, the ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled.") (Quotation omitted). I find that the ALJ did not err by not seeking a consultative examination or additional medical records from Claimant's unknown chiropractor or any other unknown source related to any hypothetical physical impairments.

Moreover, in determining Claimant's RFC, the ALJ addressed and considered Claimant's medical history and treatment for her complaints. (AR at 18-24.) In her decision, the ALJ found that "the residual functional capacity is supported by the objective evidence contained in the record. Treatment notes in the record do not sustain the claimant's allegations of disabling symptoms. . . . The claimant does experience some symptoms and limitations but only to the extent described in the residual functional capacity above." (*Id*. at 27.) The ALJ also properly considered and discussed Claimant's subjective allegations of disability in making his overall disability determination, including determining Claimant's RFC. (*Id*. at 25-26.)

Therefore, having reviewed the entire record, I find that the ALJ properly considered Claimant's medical records, observations of treating physicians, and Claimant's own description of her limitations in making the ALJ's RFC assessment for Claimant. *See Lacroix*, 465 F.3d at 887. Further, I find that the ALJ's decision is based on a fully and fairly developed record. *See Cox*, 495 F.3d at 618. Because the ALJ considered the medical evidence as a whole, I conclude that the ALJ made a proper RFC determination based on a fully and fairly developed record. *See Guilliams*, 393 F.3d at 803. Accordingly, I find that Claimant's assertion that the ALJ's RFC assessment is

flawed is without merit and recommend that the District Court affirm this part of the ALJ's decision.

**D.** *Whether the ALJ was Properly Appointed*

Claimant argues that the ALJ in this case was not constitutionally appointed because Acting Commissioner Nancy Berryhill was not properly serving as Acting Commissioner pursuant to the Federal Vacancies Reform Act when she ratified the appointment of ALJs, including the ALJ in this case, in July 2018. (Doc. 10 at 34-43.) This argument is foreclosed by *Dahle v. Kijakazi*, 62 F.4th 424 (8th Cir. 2023), *cert. denied Dahle v. O'Malley*, 144 S.Ct. 549 (2024). In *Dahle*, the Eight Circuit, unequivocally rejected Claimant's argument, concluding that "Berryhill was properly serving as Acting Commissioner when she ratified the appointment of the SSA ALJs." *Id*. at 429. Claimant acknowledges that *Dahle* "will control the outcome of this issue unless that opinion is overturned." The Supreme Court denied certiorari on January 8, 2024. *Dahle v. O'Malley*, 144 S.Ct. 549 (2024). Accordingly, Claimant's argument lacks merit and she is not entitled to relief on this issue.

### IV. CONCLUSION

For the foregoing reasons, I respectfully recommend that the District Court **AFFIRM** the decision of the ALJ.

The parties must file objections to this Report and Recommendation within fourteen (14) days of the service of a copy of this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72. Failure to object to the Report and Recommendation waives the right to de novo review by the District Court of any portion of the Report and Recommendation as well

as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

      **DONE AND ENTERED** this 4th day of September, 2024.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa